UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN E. MOYER,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       CASE NO. 1:06-cv-647-DFH-TAB
                                        )
MICHAEL J. ASTRUE, Commissioner of      )
Social Security,[1]                     )
                                        )
                Defendant.              )


ENTRY ON JUDICIAL REVIEW


        This is an action for judicial review of the decision by the Commissioner of

Social Security to deny plaintiff John Moyer's application for disability insurance

benefits and supplemental security income.  Mr. Moyer had quadruple bypass

surgery at the age of 29.  He has also developed a severe form of a skin disease

known as Hidradenitis Suppurativa that manifests itself with a series of pus-filled

boils in the armpits and groin areas.  An Administrative Law Judge (ALJ) denied

Mr. Moyer's claim after finding that he suffered from severe impairments  but was

capable of performing sedentary work.  As explained in detail below, the ALJ's

---

[1]Michael J. Astrue took office as Commissioner of the Social Security
Administration while Mr. Moyer's case was pending before the court.
Commissioner Astrue is substituted as the defendant in this action pursuant to
Rule 25(d)(1) of the Federal Rules of Civil Procedure.  The case was reassigned to
the docket of the undersigned judge on December 28, 2007.

decision must be vacated and remanded, notwithstanding the deferential standard of review that applies to the ALJ's decision.

*Background*

Mr. Moyer was born in 1972.  He has experience working as a cook, product mixer, maintenance person, and insurance salesman.  R. 68.  He underwent quadruple coronary artery bypass surgery on November 15, 2001.  R. 123-25.

Since at least as early as 1997, Mr. Moyer has suffered from a skin disorder known as Hidradenitis Suppurativa that causes boils to grow under his  armpits, on his back, in his groin area, and in his anus.  The record contains evidence that Mr. Moyer has received treatment for his boils on many occasions.  On April 9, 2001, Dr. Heck noted that Mr. Moyer had one very large cyst on his back and five others on his chest, thigh, and face.  R. 140.  Dr. Heck prescribed Accutane and Vicodin at that time.  R. 140-41.  On April 20, 2001, Dr. Heck excised 20 cysts from his back, one from the right side of his face, and one from his groin.  R. 142.

On May 1, 2001, Mr. Moyer met with Dr. Crider to discuss his boils.  Dr. Crider noted that Moyer had active lesions in his left armpit and on his left buttock, and there was evidence of a chronic lesion in his right armpit.  R. 212. Mr. Moyer reported to Dr. Crider that some of his lesions were very painful and prevented him from working.  Mr. Moyer also reported that he had boils in the

groin area frequently but not at that time, so Dr. Crider did not examine his groin area. Dr. Crider told Mr. Moyer that Hidradenitis Suppurativa is usually a chronic problem in the younger years that "burns out" as a person ages. Dr. Crider advised Mr. Moyer that one option was to excise the involved areas, which Mr. Moyer declined. Instead, Dr. Crider injected the active lesions with a steroid, which he described as a painful procedure. Dr. Crider also instructed Mr. Moyer to wash the affected areas gently with his hands and never to manipulate the boils unless he was draining a pointing, fluctuant boil.

On May 29, 2001, Dr. Durbin performed an incision and drainage of a large fluctuant abscess in Mr. Moyer's right armpit. R. 217. On October 24, 2001, Mr. Moyer had a 4.5 by 1.5 centimeter boil in his left armpit. R. 173, 184. The doctor offered to perform an incision and drainage, but Mr. Moyer declined, stating that he preferred to try antibiotics and warm soaks. R. 185. On October 27, 2001, Dr. Heck noted that Mr. Moyer had a "severe" boil in his left armpit. The boil measured 7 by 5 centimeters and was draining green pus. Mr. Moyer reported a pain level of ten out of a possible ten. Dr. Heck stated "I could barely touch the area to try to express [additional] pus." R. 149. Dr. Durbin performed an incision and drainage of the boil later that day. R. 215.

On January 9, 2002, Mr. Moyer saw Dr. Stewart because of his boils. Dr. Stewart observed an area that had opened and drained and was in the process of resolving. R. 219. Dr. Stewart noted that Mr. Moyer was taking Keflex and that

he was giving Mr. Moyer an additional prescription for Keflex to keep at home in case of a new infection.  *Id.*  On March 4, 2002, Dr. Suer noted that Mr. Moyer had lesions on his buttocks.  He prescribed Tetracycline for chronic suppression. R. 257.

On October 17, 2002, Mr. Moyer reported having several abscesses in his left groin.  Dr. Suer stated:  "He has been on Tetracycline to try to suppress these but he is just dripping purulent matter from his groin."  R. 91.   Dr. Suer prescribed Augmentin at that time.  On November 9, 2002, Dr. Durbin noted that Mr. Moyer had a boil that had opened and drained.  He observed a small area of granulation without infection.  R. 215.  On December 16, 2002, Dr. Suer noted that Mr. Moyer had a candidal infection in the groin area.  He prescribed Lamisil cream.  R. 242.

On February 17, 2003, Dr. Suer reported that Mr. Moyer had a "huge abscess" in his right armpit.  R. 241.  He stated:  "We incised and drained a fairly large pocket in the axilla, though there seem to be deeper ones involved."  At that time, Dr. Suer recommended additional surgery on the armpit and groin areas. He also prescribed Cipro and Flagyl in place of Keflex.

Finally, on June 18, 2003, Dr. Suer noted that Mr. Moyer continued to have problems with abscesses in his groin. Dr. Suer recommended a resection of the

glandular tissue in the pubic area, but Mr. Moyer stated he was very hesitant about that procedure.  R. 238.

### Testimony at the Hearing

At his January 19, 2005 hearing with the ALJ, Mr. Moyer testified that he was working for his mother-in-law at a self-storage facility.  His duties included administrative work and light maintenance work.  His mother-in-law paid him even when he was unable to work.  R. 290.  He testified that he had been diagnosed with Hidradenitis Suppurativa in 1997 after suffering from the disorder since puberty.  R. 285.  He stated that he has consistently taken antibiotics since high school because they decrease the frequency and sometimes the size of his boils.  R. 289.

Mr. Moyer testified that he gets boils under both arms, in his groin area, on his perineum, and on his buttocks.  R. 294.  He stated that when he has large boils under his arms, he is unable to lift or lower his arms.  *Id.*  When he has a boil in his groin, he is unable to walk because his pants rub against the boil and cause extreme pain.  *Id.*  He testified that he gets several boils on his genitals every month.  He testified that when he has boils in his groin area, he stays at home and spends his time lying down.  He is able to care for himself during those times but has difficulty even walking down the hall.  R. 291.  He estimated that he is unable to work once per week because of the boils.  R. 295.  He stated that

there has not been a three month period since 1997 in which he had no boils.  R. 296.

Mr. Moyer described the life cycle of a typical boil.  A boil surfaces and initially causes only a little bit of pain.  During the night, the boil builds up pressure and the pain increases.  The boil then hangs for several days as the infection pushes its way to the top.  When it is a good size and has formed a white head at the tip, Mr. Moyer stated he is able to lance it.  He said the average boil lasts for about seven days and the largest boils last up to two and a half weeks. R. 292.  Mr. Moyer rated the pain as a ten on a scale of one to ten for the bigger boils, but less for smaller boils.  R. 293.

Mr. Moyer explained that one doctor had injected the boils with cortisone as a form of treatment.  He testified that he stopped this form of treatment because the cortisone shot increased the pressure in the boil and was extremely painful.  *Id.*  (The medical expert who testified at the hearing said that he did not understand the use of cortisone to treat the condition.  R. 309.)

When asked why there were few medical records from 2003 and 2004, Mr. Moyer stated:

> Well, I'm pretty much very familiar with them anymore and it seems like anytime I would go see a doctor, all they ever wanted to do was just cut it open and that just got to be too much for me, too much cutting on me.  I mean, they were cutting me once a week and so I pretty much know how to

wait it out until it gets to the point where I can lance it myself, saves me a trip to the doctor and money, quite a bit of money.

R. 295-96.

Dr. Paul Boyce testified as a medical expert at the hearing. He stated that he did not believe Mr. Moyer had presented sufficient medical documentation to meet the requirements of Listing 8.06, the listing for Hidradenitis Suppurativa in the Social Security regulations among the list of impairments that are so severe that they lead automatically to a finding of disability for anyone not already working. R. 303. He also stated that it was possible for someone who was suffering from this disease to treat the boils as they occurred without going to the doctor. R. 310. Dr. Boyce stated that Mr. Moyer's testimony about his symptoms was consistent with someone who was suffering from Hidradenitis Suppurativa.

The ALJ then asked Dr. Boyce to provide his opinion about Mr. Moyer's residual functional capacity. Dr. Boyce stated that when Mr. Moyer had no boils, he was capable of doing medium work with some environmental restrictions based on his history of heart disease. R. 304-05 When he had a boil under his arm, he could not use his arms or lift anything heavy. *Id.* Dr. Boyce also opined that someone with a boil in the groin area would be unable to walk but would probably be able to sit with his legs stretched out. R. 307-09. A person with a boil in the perineum area would be unable to sit for extended periods of time. R. 308. Though sitting on a "donut" cushion might alleviate some of the discomfort in

sitting, Dr. Boyce did not know whether a person suffering from boils on the perineum would be able to sit for a period of six hours a day.  R. 311-12.

Vocational expert Gail Corn testified that a person who was unable to sit or walk while the boils were active would not be able to perform the full range of sedentary work.  She also testified that a person who had to be absent two days per month because of boils would not be able to hold a competitive job and could not perform the full range of sedentary work.  R. 313-14.

*Procedural History*

The ALJ concluded that Mr. Moyer was not disabled for the purpose of the Social Security Act and issued his decision denying disability insurance benefits and supplemental security income on September 15, 2005.  R. 13-23.  The Appeals Council denied Mr. Moyer's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Mr. Moyer now seeks review by this court of the denial of his application. The court has jurisdiction in the matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

*Disability Standards and Judicial Review*

To be eligible for disability insurance benefits and/or supplemental security income, a claimant must establish that he suffers from a disability within the meaning of the Social Security Act.  The claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Mr. Moyer was disabled only if his impairments were of such severity that he could not engage in any kind of substantial work existing in the national economy, regardless of whether such work was actually available to him.  *Id.* at §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the ALJ must apply the following five-step inquiry:

(1)     Has the claimant engaged in substantial gainful activity?  If so, he is not disabled.

(2)     If not, did the claimant have an impairment or combination of impairments that were severe?  If not, he is not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, he is disabled.

(4)     If not, could the claimant do his past relevant work?  If so, he is not disabled.

(5)     If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he is not disabled.  If not, he is disabled.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); see generally 20 C.F.R. §§ 404.1520, 416.920.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, the ALJ determined at step one that Mr. Moyer had not performed substantial gainful activity since the alleged onset of his disability.  At step two, he determined that Mr. Moyer had severe impairments that limited his ability to perform basic work activities based on his Hidradenitis Suppurativa and coronary artery disease.  At step three, the ALJ concluded that Mr. Moyer did not meet or equal the requirements of Listing 8.06 because he did not present sufficient medical documentation about the severity or frequency of his boils.  At step four, the ALJ found that Mr. Moyer was not capable of performing his past relevant work.  At step five, the ALJ concluded that Mr. Moyer had the residual functional capacity to perform the full range of sedentary work. The ALJ concluded that Mr. Moyer was not under a disability at any time through the date of the decision and was therefore not entitled to disability insurance benefits or supplemental security income.

*Standard of Review*

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . ." *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The court must not attempt to substitute its judgment for the ALJ's judgment by re-weighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689.  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based his decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  This determination by the court requires that the ALJ's decision adequately discuss the relevant issues:  "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."  *Briscoe*, 425 F.3d at 351, citing *Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994). Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion."  *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), quoting *Dixon*, 270 F.3d at 1176.

*Discussion*

I.    *Listing 8.06*

Mr. Moyer first challenges the ALJ's finding that his impairment did not meet or equal Listing 8.06 for Hidradenitis Suppurativa.  Listing 8.06 requires "extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 8.06.

Listing 8.06 includes three separate requirements. First the claimant must have extensive lesions. Second, the lesions must be located on both axillae (armpits), both inguinal areas (groin), or the perineum (the area between the anus and the genitals). Third, the lesions must persist for at least three months despite continuing treatment. It is undisputed that Mr. Moyer has had lesions on both his armpits, both sides of his groin, and his perineum. The ALJ found that Mr. Moyer's condition did not meet or equal this Listing because the record did not show the required degree of severity or persistence. R. 15.

A.   *Severity*

For purposes of Listing 8.06, Listing 8.00(C)(1) defines the term "extensive skin lesions" as "those that involve multiple body sites or critical body areas, and result in a very serious limitation." The Listing provides examples of extensive lesions, which include "lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity . . . ." and "lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate." 20 C.F.R., Pt. 404, Subpt. P, App. 1 §§ 8.00(C)(1)(a), 8.00(C)(1)(c).

Mr. Moyer has presented medical evidence that he suffered from boils underneath both of his arms which seriously limited his use of both of his arms. On May 1, 2001, Dr. Crider noted an active lesion in the left armpit and evidence

-13-

of a chronic lesion in the right armpit.  R. 212.  In October 2001, Dr. Heck noted a "severe" boil in the left armpit, R. 149, which Dr. Durbin later drained.  R. 215. On February 17, 2003, Dr. Suer noted that Mr. Moyer had a "huge abscess" in his right armpit.  R. 241.

Mr. Moyer has also presented medical evidence that he suffered from boils in his groin.  On October 17, 2002, Dr. Suer reported that Mr. Moyer had several abscesses in his left groin that were dripping pus.  R. 91.  Two months later, on December 16, 2002, Dr. Suer noted that Mr. Moyer had a candidal infection in the groin area but did not specify on which side the infection was located.  R. 242. None of the doctors specifically noted that Mr. Moyer had a boil on his perineum. However, it is possible that Mr. Moyer and his doctors used the term "groin" to refer to the inguinal areas, the perineum, and the genitals.

Though Mr. Moyer has presented sufficient medical evidence that he suffered from boils in many critical body sites, his medical records do not demonstrate that he suffered from boils in multiple critical sites at the same time. All of the examples provided in Listing 8.00(C) include the inability to use multiple parts of the body (two extremities, the soles of both feet, both inguinal areas) at the same time.  Listing 8.06 specifically states that the lesions must involve both axillae, both inguinal areas, or the perineum.  Though Mr. Moyer testified that he got several boils on his genitals every month, R. 294, he did not specify whether he got boils in multiple critical areas at the same time.

In addition to the scarcity of medical evidence about the severity of the boils, one of Mr. Moyer's treating doctors also opined that Mr. Moyer's boils were not severe.   On February 27, 2002, Dr. Crider stated:   "Hidradenitis lesions can certainly be painful & a nuisance but I have never seen a [patient] disabled by the condition & Mr. Moyer's was not severe."  R. 210-11. (Dr. Crider saw Mr. Moyer only once, for one of his less severe episodes.  Although Dr. Crider has not seen a patient disabled by the condition, the Social Security regulations recognize that the condition can be disabling, as the existence of Listing 8.06 shows.)  Apart from Mr. Moyer's own testimony about the severity of his symptoms, the ALJ heard other  substantial evidence to support his conclusion that Mr. Moyer's condition did not meet the requirements of Listing 8.06 in terms of severity.

B.     *Persistence*

Listing 8.06 also requires that the extensive skin lesions persist for at least three months despite continuing treatment.   The general Listing about skin disorders states: "By persist, we mean that the longitudinal clinical record shows that, with few exceptions, your lesions have been at the level of severity specified in the listing."  20 C.F.R., Pt. 404, Subpt. P, App.1 § 8.00(G).  To meet Listing 8.06, Mr. Moyer would have to present longitudinal clinical records showing that his lesions were at the required level of severity for at least three months, despite continuing treatment.  As explained above, Mr. Moyer has not provided medical

evidence that his lesions were at the required level of severity for any period of time.

Dr. Boyce, the medical expert who testified at the hearing, pointed to a lack of medical evidence that Mr. Moyer's boils were persistent.   He stated:

> He certainly has the problem and the medical record supports that he's had treatment but it doesn't show that it's – the record itself does not show that it's ongoing, chronically, all the time.  It's recurring from time-to-time and that can occur.  The issue is, is it there so frequently that it's not really resolving.  The record doesn't spell that out very well.

R. 303.  Dr. Boyce's comments and the lack of more extensive medical evidence of severe boils provide substantial evidence to support the ALJ's conclusion that Mr. Moyer did not show the required persistence of his boils to meet Listing 8.06.

II.   *Credibility Determination*

To determine whether Mr. Moyer could return to his past relevant work and his residual functional capacity, the ALJ found it necessary to evaluate Mr. Moyer's credibility.  The ALJ found that Mr. Moyer was credible to the extent that the record supported his assertions that he had boils and they limited his ability to function to some degree.  However, the ALJ found that his claims about the frequency and severity of the boils were not credible.  Mr. Moyer argues that the ALJ erred in finding him only partially credible.

The ALJ is not "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work." *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).  However, the ALJ is required to consider statements of the claimant's symptoms and how they affect his daily life and ability to work.  20 C.F.R. §§ 404.1529(a), 416.929(a).  There is a two-part test for determining whether complaints of pain contribute to a finding of disability.  First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms the claimant alleges.  20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b).  Second, the ALJ must consider the intensity and persistence of the alleged symptoms.  The ALJ considers these factors in light of medical evidence and any other evidence of:  the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  After considering whether the evidence shows that the claimant acts on a day-to-day basis as a person who is really suffering from the symptoms the claimant has alleged would act, the ALJ makes a credibility determination.  20 C.F.R. §§ at 404.1529(c)(4), 416.929(c)(4).

The ALJ is in the best position to observe the demeanor of a witness, so the court ordinarily will not set aside an ALJ's credibility determination as long as it

is supported by the record and is not "patently wrong."   *Herron*, 19 F.3d at 335. However, reviewing courts are in a better position to review an ALJ's credibility determination when it rests on objective factors or fundamental implausibilities rather than subjective considerations or observations.  *Id.*

Here, the ALJ acknowledged that there was medical evidence to support Mr. Moyer's claims that he suffered from severe boils and that his work history demonstrated that he had not worked regularly as an adult.  The primary reason the ALJ provided for questioning Mr. Moyer's credibility was the lack of medical records to confirm his allegations that he had nearly constant boils.  R. 17.  The ALJ noted that Mr. Moyer had testified that in recent years he generally treated his boils on his own (by lancing them after they showed a white head), and that he did so to avoid the expense of medical treatment and because he believed some forms of the treatment complicated his condition.   The ALJ rejected this explanation, stating:

> His allegation is one explanation of why medical documentation of extensive boils is not in the record.  On the other hand, another reasonable inference from the generally not-well-documented medical history is that the boils were less severe than the claimant alleged and did not require medical intervention.  Overall, the claimant's essentially unverified version of events must be rejected as lacking credibility.  Reason dictates that a medical condition that is debilitating will, more often than not, be brought to the attention of a physician. . . .  In this particular case, the claimant's position of being financially destitute such that he is unable to afford even basic treatment for his boils is inconsistent with the record as a whole which documents significant medical treatment and the claimant's family connections that allowed him to be paid nearly at the level of presumptive substantial gainful activity.  In rejecting the claimant's explanation of the scant record of treatment for his boils, it is much more reasonable that the

record is silent because the condition did not arise and not because the claimant chose to wait until the condition was unbearable. The explanation that he waited until the boils grew and became more painful until he made any effort to treat them is without merit as not being reasonable in that it requires that he knew what to do, but instead waited until his pain increased to the point that he was unable to stand it before taking action.

R. 17-18.

Many courts, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, especially when he or she is unable to afford it. See, *e.g.*, *Herron*, 19 F.3d at 336 & n. 11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits."), citing *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir.1989); *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989) (ALJ should consider in first instance whether lack of financial resources is claimant's motivation for failing to seek medical attention); *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (holding that ALJ erred by discrediting claimant's complaints of disabling pain where claimant's testimony that she could not afford further treatment was uncontradicted by the record); *Caviness v. Apfel*, 4 F. Supp. 2d 813, 820-21 (S.D. Ind. 1998) (ordering remand where ALJ failed to consider claimant's financial resources and the limited effectiveness of treatment when relying on absence of more frequent treatment to discount credibility). In *Thompson v. Sullivan*, the Tenth Circuit identified four factors that an ALJ should consider when deciding whether a claimant's failure to pursue treatment contradicted the claimant's subjective complaints: (1) whether the treatment at

issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and if so, (4) whether the refusal was without justifiable excuse.  987 F.2d 1482, 1490 (10th Cir. 1993), quoting *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).

The record shows that Mr. Moyer saw at least five doctors for his boils in the period between 2001 and 2003.  The doctors he saw occasionally drained and excised boils.  The doctors also prescribed many different medications to suppress the boils.  Mr. Moyer tried Accutane, R. 140; Keflex, R. 219; Tetracycline, R. 257; Augmentin, R. 91, 238; Lamisil, R. 242; and Cipro and Flagyl, R. 241.  Boils continued to appear while Mr. Moyer was on these medications, even in the sensitive areas in which Mr. Moyer had undergone surgical procedures in the past.

On May 1, 2001, Dr. Crider noted that he discussed general skin care issues with Mr. Moyer.  Specifically, he noted that he told Mr. Moyer: "never manipulate lesions unless draining a pointing/fluctuant HS lesion." R. 212.  This certainly implies that Mr. Moyer was able to drain a boil on his own, though he would have to wait until it had developed a head or a point.  This also explains why Mr. Moyer would have waited for the boils to grow, despite the pain.  Dr. Boyce, the medical expert, testified at the hearing that it was possible for someone who had suffered from this condition for a long period of time to treat himself at home without seeing a doctor.  R. 310.

The record shows that Mr. Moyer had less than $2200 per year in FICA earnings in each of the years from 1997 to 2002.  In 2003 and 2004, he earned less than $10,000 per year.  R. 58-62.  He is married and has a small child.  He found the financial resources to seek some medical treatment for his significant heart disease and to treat some of his most severe boils.  It is difficult to understand why that approach should be held against him in evaluating his credibility.  Notwithstanding the ALJ's statements about what is reasonable, it would have been quite reasonable for someone in Mr. Moyer's financial position to consider both his finances and the likely effectiveness of treatment when deciding whether to seek medical attention, especially where there is no indication from the record that visiting the doctor more regularly would have alleviated or prevented any of the symptoms  Mr. Moyer described.  See *Caviness*, 4 F. Supp. 2d at 821 (remanding where ALJ relied on absence of treatment to discount claimant's credibility, while failing to address her financial situation or the limited effectiveness of treatments).

Given this history, it is not surprising or unreasonable that Mr. Moyer did not seek medical attention whenever a boil appeared.  He was able to lance the boils on his own without incurring any expense.  It is also not surprising that Mr. Moyer was hesitant to undergo a resection of the glandular tissue in his pubic area in April 2003.  It was reasonable for him to be reluctant to undergo surgery in a sensitive area when all previous surgeries had been ineffective.

In evaluating credibility, the ALJ also overlooked some important evidence: Mr. Moyer's record of work.  Mr. Moyer had worked for his father and more recently for his mother-in-law in different jobs.  He missed too much work to continue working for his father.  His work for his mother-in-law was subsidized, at least to the extent that he would be paid even if he did not work, and she apparently gave him a great deal of flexibility in his schedule.  Such efforts to earn some money within the constraints of an impairment that was not constant but frequently incapacitated him would tend to weigh in favor of his credibility.  See *Caviness*, 4 F. Supp. 2d at 822.

For these reasons, the court concludes that the ALJ failed to build a logical bridge between the evidence and his credibility findings.  In other parts of his opinion, the ALJ cited Mr. Moyer's ability to play golf as inconsistent with his subjective complaints.  One medical record from June 18, 2003 refers to Mr. Moyer's ability "to walk 18 holes of golf."  R. 238.  Another medical record from December 18, 2001 states that Mr. Moyer asked how soon he would be able to go back to golfing after his heart surgery and described himself as an "avid golfer."  R. 120.  It is easy to understand how evidence that a person who claims to be disabled is golfing could tend to undermine his credibility.  In light of the record as a whole, however, this evidence deserves closer scrutiny.  Mr. Moyer points out that his cardiologists told him he should walk a good deal.  See R. 287.  There seem to be only two references to golf over several years, and there is no clear evidence about its frequency.  The ALJ did not ask Mr. Moyer about his golfing

during the hearing, when it might have been possible to explore it in more detail as needed to evaluate its true probative value.

The ALJ also noted the absence or lack of severity of boils at two of Mr. Moyer's doctors' examinations. Mr. Moyer has not claimed that he was never able to work. Rather, he has claimed that when he has had boils under his arms, in his groin area, and on his perineum, he has had difficulty using critical parts of his body and has been unable to work too frequently to hold a competitive job (as opposed to a subsidized job with a family member). The ALJ's discussion of this evidence did not differentiate between Mr. Moyer's condition at his best and at his worst. Without more detailed consideration of the issue, it was an error for the ALJ to consider evidence of Mr. Moyer's activities or medical examinations when he was at his healthiest as inconsistent with his complaints about times in which he had severe boils. See *Caviness*, 4 F. Supp. 2d at 822 (similarly remanding where impairment was intermittent and ALJ compared claimant at her best with her testimony about her worst symptoms).

The ALJ's determination that Mr. Moyer was only partially credible led him to conclude that Mr. Moyer's condition (a) did not medically equal Listing 8.06 and (b) did not prevent him from performing the full range of sedentary work. First, the ALJ discussed Mr. Moyer's credibility when determining if his condition medically equaled Listing 8.06. Listing 8.00 specifically states that frequent,

-23-

serious flare-ups of a skin disorder may constitute a disability even if they do not meet the requirements of a Listing:

> [I]f you have frequent flareups, we may find that your impairment(s) is medically equal to one of these listings even though you have some periods during which your condition is in remission. We will consider how frequent and serious your flareups are, how quickly they resolve, and how you function between flareups to determine whether you have been unable to do any gainful activity for a continuous period of at least 12 months or can be expected to be unable to do any gainful activity for a continuous period of at least 12 months.

Listing 8.00(C)(2).

The ALJ did not perform this detailed inquiry.  In his discussion of step three, the ALJ simply stated:  "Although he has had boils . . ., his allegations that these have been extensive and persistent, despite treatment, are not fully credible to the extent required by the listing."  R. 15.  If upon reconsideration the Commissioner concludes that Mr. Moyer is credible, it will be necessary to analyze the frequency and seriousness of his flare-ups and how quickly they resolved to determine if Mr. Moyer's condition medically equaled Listing 8.06.

The ALJ's determination that Mr. Moyer was only partially credible also affected his assessment of Mr. Moyer's residual functional capacity.  After finding that Mr. Moyer was able to sit for up to six hours per day, the ALJ concluded that he was capable of performing the full range of sedentary  work.  This conclusion was similarly dependent on the credibility finding.  First, the ALJ's summary of

the medical expert's testimony on the issue of sedentary work was inaccurate. The ALJ stated: "Dr. Boyce explained that sedentary work would allow the claimant to continue to work even when his boils affected his lower extremities in the groin and perineal area and his upper extremities in his axillae (armpits)." R. 20. Dr. Boyce actually testified that he believed Mr. Moyer could sit for extended periods of time when he had a boil in the groin area if he were able to stretch his legs out a little bit. However, if he had a boil on his perineum, Dr. Boyce testified, Mr. Moyer would not be able to sit or walk for extended periods of time. R. 308-09. Based on Dr. Boyce's actual testimony, when Mr. Moyer had boils on his perineum, he would have been unable to perform sedentary work.

Second, Mr. Moyer testified that he had boils on his perineum "[q]uite frequently." R. 294. If the ALJ had found this testimony credible, it would have followed from Dr. Boyce's testimony that Mr. Moyer would not have been able to perform sedentary work on the frequent occasions in which he had boils on his perineum. The vocational expert testified that if a person missed two days of work per month, that person would not be able to maintain a regular job. R. 314. If the ALJ had found Mr. Moyer credible on this point, he likely would not have found that he was able to perform sedentary work.

Because the ALJ's credibility determination was flawed, the case must be remanded for a new credibility determination. The Commissioner must then decide whether Mr. Moyer's condition medically equaled Listing 8.06. If not, the

Commissioner should proceed to consider step four, and if necessary, step five of the disability analysis.  Also, this entry is not intended to bar the Commissioner upon remand from reconsidering any issue relevant to other steps.

*Conclusion*

The court cannot answer the question whether Mr. Moyer was actually disabled for the purposes of the Social Security Act.  The ALJ's determination that Mr. Moyer's condition did not meet the requirements of Listing 8.06 is supported by substantial evidence.  However, the ALJ  erred in his credibility determination by relying heavily on Mr. Moyer's failure to seek more regular medical treatment, by overlooking some important evidence, and by failing to differentiate between Mr. Moyer's capabilities when he was suffering from severe boils and in his healthier phases for this severe but intermittent impairment.  The Commissioner needs to take a closer look at the evidence weighing in favor of and against Mr. Moyer's subjective complaints to determine if his condition medically equaled Listing 8.06 and to evaluate his residual functional capacity.  Accordingly, the decision of the Commissioner is vacated and the case remanded for further proceedings consistent with this opinion.

So ordered.

Date:  February 4, 2008

_David F. Hamilton_

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

John P. Young
ATTORNEY AT LAW
john@youngandyoungin.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov